The third case, Dixon v. NYK Reefers. Mr. Cummings, please come down. Thank you, Your Honor. Good morning. May it please the Court. My name is Sean Cummings. I represent Antoinette Dixon. There's three main issues why this Court should reverse the lower court's decision in this case. First, because the decision is contrary to this Court's prior precedent, Clark v. Bethello, as well as four other Federal Circuit cases. Second, because there was a custom in place that required the vessel to act under the circumstances of this case. And third, because there's genuine factual disputes that compel reversal. To the first point, regarding the dangerous condition at issue in this case, the lower court granted summary judgment and said, and I'm quoting the lower court, said, only a defect in the vessel or in the vessel's equipment triggers the duty to intervene. That language is contrary to this Court's decision in Clark v. Bethello. Well, Clark didn't find any liability on the vessel, did he? That's correct, Your Honor. In fact, Clark So anything I said beyond that's dicta, is it not? It is dicta. I would agree with you. Even assuming you're right about that, I don't see how there's knowledge of a dangerous condition as opposed to knowledge of a dangerous way in which the stevedores conducting the operations of the longshoremen are carrying it out. And I think that's exactly the distinction. Whether the vessel had actual knowledge or not is a factual dispute. And there are facts in the record . . . Actual knowledge of the operations and how they were being improperly performed as opposed to actual knowledge of a dangerous condition involving the vessel. That's correct. And I think that's the distinction where the district court went too far is to . . . Your position is anytime someone on the vessel in a position of authority sees that longshoremen are doing something that may be risky or dangerous, the vessel has an obligation to do what? Fire the stevedore? Well, no. To intervene. But I would characterize . . . Suppose the vessel goes to intervene and the longshoreman says, We work for Stevedore, Inc. Leave us alone. Yeah, but the vessel, even in this case, acknowledges that the vessel has the authority to step in and intervene and shut down the operation when it wants to. But I wouldn't . . . So it has a duty to monitor the operations. Or if it sees an operation it thinks is dangerous, it's got to shut it down. It does not. And I would make a distinction between just . . . When does it have to shut it down? When they recognize that the stevedore is exercising obviously improvident judgment, which is what the Supreme Court said in Sendia, in continuing their work in the face of a known danger. So it's not just a little risky behavior. It's not just they're doing something a little negligent. The vessel has to have an acknowledgment of obviously improvident judgment in continuing the stevedore's operation in the face of that danger. So in other words, the more the stevedore is negligent, the higher the vessel's responsibility to intervene because they can see these guys . . . But Sendia said the ship is not the common employer of the longshoremen. That's right. But Sendia also imposed the duty to intervene. That's where all this comes from. The Sendia court said that when a vessel acknowledges it's obviously improvident judgment by the stevedore, their duty to act arises at that point. They have to intervene. It seems to me like you've got an evidentiary problem in addition to what Chief Judge Carnes is raising. You've got a captain who's asleep and doesn't know what's going on up on the deck. And then you've got crew members who see what's going on, but there's no evidence that they know that this is a dangerous condition. Well, I think there is evidence. The captain actually said in his deposition . . . That's the captain, not the crew member. Correct. So I think there's actual knowledge that can be at least inferred at this level. And I'm not talking about constructive knowledge. I'm talking about we're allowed an inference at summary judgment that says if the crew is . . . In other words, the facts are the captain testified himself that I'm aware that this operation was being done without a flag person. Yeah, he . . . And without any kind of alternative warning system to warn the longshoremen of what was going on over their head. And then we have the statement . . . That's true, but I think it becomes a jury question. And then you've got crew members who may know that there is that lack of visibility, but there's no evidence that the crew members knew that they needed a flagman. Correct, because we haven't been able to depose the crew members. They are basically Russian citizens, and we haven't been able to find. But what we have, Your Honor . . . Without evidence, it just seems like you don't . . . Even if we assume that there is a duty to intervene without us withholding it, it just doesn't seem to me you've got the evidence. Well, I've got two witness statements that place them in the proximity. I've got the captain who says their responsibility is to monitor the cargo operations for safety and for proper use of the lifting devices, which is the cranes that caused Mr. Dixon's death. So from that, a jury . . . They've got to know that there's a dangerous condition. I don't see where they have that. You've got evidence that they have that. The only thing you've got is the testimony of a captain who's asleep and isn't seeing what's going on. I don't know that he is asleep. The captain said he's in the cab of the vessel, and he recognized . . . He's in his personal living quarters. Correct, in his cabin. But he said that he knew that the operation was being conducted without a flag person, without anyone. Going over and over again the same thing, but you admitted that there's no evidence, though, that he knew about the problem with unrestricted visibility. I agree with that. And then I think it becomes a jury question as to whether or not this operation was so dangerous that the stevedores was exercising the obviously improvident judgment. What is your best decision? I think there's two. What is your best decision of the Supreme Court or the Eleventh Circuit that the vessel's knowledge of anything other than a dangerous physical condition puts an obligation? In other words, if somebody for the vessel observes that the longshoremen are engaged in risky behavior, what's your best holding that that imposes an obligation on the vessel? I think there's two, but I'll address Gill v. Hango, which is from the Fourth Circuit. Did you not hear? I did hear. Of the Supreme Court or the Eleventh Circuit? The only Eleventh Circuit president on this issue is Clark v. Bethel. But Clark was a puddle of grease, which is a dangerous condition, not dangerous activity by longshoremen. And I agree with that. And the only point in citing Clark is that the district court's decision in this court is more narrow than even Clark allows. According to the dangerous condition, as the district court defines it, even Clark would fail because there's not a defect in the vessel or its equipment. We're not grading the district court. We've got de novo review of its decision in these circumstances because it's not factually based. To the extent there are fact findings implicit in it, it's clearly Iran's review. But applying the law to the facts, a puddle of grease is a dangerous condition. Longshoremen operating shorthandedly or in a risky way is not a dangerous condition. That's dangerous behavior. And the distinction I think that's important is that conditions are more in the province of the vessel. And the thing that the amendments were designed to do and the thing that a lot of decisions have held the line on is we're not going to put the vessel in charge of supervising the longshoremen. That's correct. The case that I would cite would be Davis v. Partin-Rudiri, which is a case where the Ninth Circuit found a danger in the- So you have no Supreme Court or Eleventh Circuit case- There are none. that deals with the operation- There are none. where the ship is responsible for intervening in the operation. Correct. In fact, any decision as to whether you're supposed to have a spotter is a decision of the longshoremen, not the vessel. Isn't that correct? It is. The decision in the first instance is of the stevedore. The first instance, the only instance. But if the vessel recognizes that that is obviously improvident- What case says that? that they are responsible to intervene in the operation? Davis v. Partin-Rudiri, which is a case where the vessel was lowering cargo in a close proximity to the gangway. That was the only thing. There was no defects at all. No gear was defective. No ship was defective. It was just the manner in which things were being done. By the vessel. By the vessel. By the vessel. They were lowering the cargo too close to the gangway, and the court said that the vessel could be held liable under those circumstances. Here, the danger was not the vessel. The danger was the longshoremen's method of doing what they were doing. That's correct. That is correct. Let me also spend some time talking about the custom, because here, even when it relates to custom, the lower court said that because Antoinette fails to allege or show a defect in the vessel or the vessel's equipment, her reliance on custom fails. The district court also said that when it relates to custom, you still have to have a defect in the ship or its equipment. But there's no support for that. In fact, Cyndia said that we are of the view that absent custom to the contrary, the shipowner has no general duty by way of supervision or inspection to discover dangerous conditions. So what Cyndia said is, look, if you don't have a custom to do these things, we're not going to impose that duty. But if you have a custom to do it, then you can hold it. It didn't hold that if there is a custom, that you have that duty. Right, but it said that custom alone can impart that duty. And the First Circuit said, and they addressed that exact issue just prior. They said, a duty may arise if the vessel owner was obligated by custom to monitor stevedoring operations for the purpose of remedying unsafe conditions. That's Keller versus U.S. and also England versus Ryanair. So they both addressed the issue of this custom that can be related to monitoring stevedore operations for the purpose of remedying unsafe conditions, which is exactly what Captain said in this case. And that takes me to the factual dispute. But what we said in Spence was, the vessel's mate customarily can overrule unloading procedures that he believes would damage the vessel. He has the customary authority to do this. Nevertheless, that falls short of suggesting that the mate was by custom obligated to assure the safety of the longshoremen or inspect for dangers growing out of their work. Correct. I think it depends on what the factual circumstances are of the custom on that vessel. He customarily can intervene and overrule the longshoremen's procedures if he believes it would damage, cause damage. He can, but here the captain went farther. And the captain said, we always place two or three people on the deck of the vessel specifically for the purpose of monitoring for unsafe practices. And he said, if it's unsafe, we demand termination of the cargo operations being carried out. Is that testimony enough to establish a custom? I thought a custom would be some kind of generally accepted practice in the industry. I think the testimony is enough. My time is running short. Can I just address the Court's question? In England, for example, the England v. Ryan Al, that Court said that the captain's testimony was basically dispositive on the issue. There, the captain said, our custom is to inspect the mooring lines to make sure there's not too much pressure. When it snapped and caused injury, the Court said that the captain's own testimony said that they do this thing, and so they have to always do that thing. Here, it's not only the captain's testimony, but also the checklist that I've cited in the brief that say we have a duty to monitor. You understand what you're asking us to tell the vessel when it's injured? I'm asking the Court to tell the vessel that if it has a custom, it has to actually do its job. And so the vessel and the insurer will get together, as pencil pushers do, or their pencil pushers will get together and say, look, if we monitor these and try to protect the longshoremen, we're going to be held liable. But if we don't, if we say, you're on your own, boys, good luck, press the red button to summon an ambulance, then we're not responsible, so let's don't have any customs that tries to protect the longshoremen. That's a perverse incentive, wouldn't you say? I wouldn't say, and here's why I say I don't think it holds true. The England case and the U.S. v. Keller case said exactly that, but this case is evidence that vessels still continue to monitor their cargo operations. Well, we haven't extended that to this circuit. In other words, we haven't told them if you do anything to protect the longshoremen, we're going to hold it to you, and if you negligently do it or don't do it at all or somebody's looking the other way, you're going to be liable for it. I mean, that's bad economics and bad law. I understand the court's concern, but CINDIA imposed that language, and what else could it mean that they have a duty to act in accordance with a custom regardless of what that means? Well, it could mean custom throughout the shipping industry, for example. But we've got your argument on that. You've got three minutes. We'll give you all of them. And Mr. Schuster, you have 15, of course. Good morning. May it please the Court. My name is Tim Schuster, and I represent NYK Reefers Limited and Cool Carriers. On behalf of my clients, I ask that you affirm the trial court's summary judgment holding that the shipowner cannot be liable in this situation because no defect in the vessel or its equipment was demonstrated. In my view of the 1972 amendments of the Longshore Act and CINDIA, what those mean is that there are no instances in which the vessel can be held liable for the negligence of the stevedore. And in this case, the only thing that's alleged are things that are negligence of the stevedore. You could be held liable if a combination of a dangerous condition and negligence produced an injury, wouldn't you say? Suppose the vessel knew there was a dangerous condition and said, well, that's not going to cause any injuries if they're alert and watching where they're stepping and are very careful. And as it turns out, somebody was preoccupied in the combination of the negligence of the longshoreman and the dangerous condition that the vessel knew about and didn't remedy resulted in an injury. If it was a dangerous condition of the vessel or its gear, for instance, you mentioned before a grease spot on the deck. Sometimes that can be a dangerous condition of the vessel if the source of that grease was the vessel. For instance, if the hydraulic hose on the crane starts leaking. Well, if the source of the grease is a previous longshoreman operation and the vessel just leaves the grease there. I mean, I just don't see how you can say that can't in any circumstance be liable for an injury that results from longshoreman negligence. If it's longshoreman negligence plus a dangerous condition that the vessel knew about and didn't intervene to prevent injury or didn't clean up to prevent injury. But that's not here. Go ahead. Okay. Well, my response to that would be if the vessel had that duty, what Cindy clearly tells us is once the stevedoring operation begins, that the vessel has no duty to inspect or supervise the longshoreman. And in this case, that duty was met. We met the first duty, the turnover duty that's conceded. So we turned over the vessel in a reasonably safe condition. After that, Cindy tells us that we're allowed to rely on the judgment of the stevedore as to how he conducts his operations. And in this case, I agree with your comments, Chief Judge Carnes, that it would be an odd situation if the vessel came in and didn't have its own safety plan. I think it's settled law that the vessel is always responsible for the cargo, for the vessel, and for its own crew members. And so it has people on deck. And what the captain testified to also was that the purpose of those people on deck was to keep an eye out for the cargo and to keep an eye out for the vessel. So if they're using the crane in some way that's going to damage the vessel, they would go and talk to the stevedore. And I think the captain clarified he couldn't run out and tell the longshoreman anything. All he could do was go to talk to the stevedore superintendent if someone told him something was wrong. And he testified that prior to the accident, no one had raised any issue with the crew or with him that there were any dangerous conditions that the longshoremen were facing. And I think it's an important fact in this case that on this issue of the flagman, in this instance the same vessel, the same longshoreman, unloaded the same ship the week before. And the evidence in the case is they didn't use flagman then, they didn't use flagman later that day after the accident when they resumed operations, and they didn't use flagman in the next three years before we took their depositions. And Logistec testified they had been discharging fruit ships in Port Manatee since around 2003, and their custom was not to use the flagman. They had their own safety rules to account procedures so that they could do that without using flagman. Isn't the narrowest way to resolve this matter to say that even if there were, even if we assumed that there could be a duty and intervene, he didn't have sufficient evidence? That would be the easiest way to do it, yes. But I think the 11th Circuit precedent on this, in the cases like Clark or Lampkin or probably the Hunter case, all of those cases mention the language from Cyndia that says the shipowner can only be liable if there's a defect in the ship or the equipment. It's a dangerous dish that the vessel knows about on the vessel, the puddle of grease. You're going to draw your line on non-liability of puddle of grease that's been there for two weeks? The vessel knows about it or should know about it, and they don't do anything about it except tell their employees, be sure to watch out for that puddle of grease. We're not going to clean it up until we get to Hong Kong, and then the long shoreman trip on it. Now, come on. Dangerous condition. There are facts. I agree, Your Honor. There are facts. Dangerous condition the vessel knows about. The vessel knows about and has some duty. And I think the confusion of Dixon's position in some of these cases where they're arguing a duty to intervene through custom, for instance, the gangway case that was mentioned or the mooring lines. Those really aren't duty to intervene cases. The other thing that Cyndia tells us is that the ship owner can be liable, one, if it actively involves itself in the stevedoring operation, or if something goes wrong in an area of the ship that it actively controlled. And what we see in those cases is, for instance, the case with the mooring lines, is that there was a custom that the ship stayed actively involved in tending the mooring lines and they breached their duty of care in tending the mooring lines. Same thing with the gangway, that there was a custom that the ship would stay actively involved in maintaining the gangway and they breached their duty. We don't have those facts here. Dixon argues this issue of custom because the ship had a safety plan and because the chief mate and the third mate were out on deck, but there's no evidence as to what the chief mate or the third mate were doing. The longshoremen testified they had never been down in the hold. The longshoremen testified they had never talked to the crew members about anything. And the ship superintendent from the stevedore side testified that he didn't tell the ship anything about how they were going to unload the ship or how many longshoremen they were going to use. So I would also argue that for there to be a custom, there would have to be some evidence that the ship actually supervised or did something to control the longshore operation for the benefit of the longshoremen, and we don't see that in this case. I also think the definition of obviously improvident judgment has been taken out of context. In Cyndia, the discussion of obviously improvident judgment related to a defect in the ship's winch and the fact that it had been defective for a couple of days and a jury could find that the ship's ignoring the use of its own equipment that was defective could be obviously improvident judgment. I think the best definition is in the Greenwood case from the Fifth Circuit where they say obviously improvident judgment is use of a piece of equipment that is so obviously defective that it's obvious to anyone that continued use is a danger, and we simply don't have that here. We have different opinions perhaps of use of the lifting tray, but we don't have anything that involves the ship's equipment. I think it's important that all of this equipment was provided by the stevedore. One final thing I want to do or two final things. The issue of the alarms that was raised since we met the turnover duty. I really think that's a red herring that if the ship was regarded as safe by the stevedore without those alarms, everyone knew those alarms were there, then the operational method of the stevedore and not using flagmen doesn't suddenly make the cranes defective. The last thing I wanted to mention is the issue of liability of the time charter. Below, Judge Meraday said he didn't get to the separate issue of whether the time charter was liable. It seems like in Dixon's briefs they described the vessel as being the owner and the time charter as if they were jointly and severally liable, but there's no case that says that. The time charter would have to have some independent acts of negligence. The only evidence in this case is that the time charter didn't have anyone on the vessel, didn't have any responsibility for operating the vessel. If there's no other questions, I would urge the court to affirm the summary judgment below. Thank you. Thank you. Mr. Cummings, three minutes. Thank you, Chief Judge Carnes. I think the court's right that taking the position that there can be no liability on a vessel without a defect in the ship or its gear goes too far. In Liegi, for example, which is a second district court case which also was a grief spot, that court differentiated between defects in the ship and its equipment and transitory substances. So clearly even the second court in this court in Clark v. Bethel, which is the same condition, the holding wasn't about it. It was about knowledge in that case. It wasn't about the condition, but the Eleventh Circuit did say that if the plaintiff in that case could have shown knowledge, then the vessel could be liable under the circumstance, which was not a defect in the ship or its gear. I also want to talk just quickly about this reliance on the stevedore. The same Second Circuit opinion said, we've held that when the ship owner knew of a condition, and they say condition, and stood silently by, the owner could not escape liability as a matter of law by reliance on the stevedore for the correction of the condition. You can only rely on the stevedore until such time that their judgment becomes obviously improvident. That's the whole duty to intervene issue. That's what the Supreme Court said is you can rely on the stevedores until they do things that are so reckless and they put people's lives at risk. Then you've got to step in and do something, Vessel. That's the whole duty to intervene. So you can only rely on the stevedore up to a certain extent. I also want to address just briefly the vessel's contention about flag people not being used before and after. The court in Gill v. Hanga, which is fourth, said, an accident that is unprecedented or extraordinary is not necessarily unforeseeable, and nor is proof of adherence to an industry practice or custom dispositive on the issue of negligence. And that makes sense. Just because you always did it dangerously doesn't mean that when something happens, it hasn't always been dangerous. So that argument fails. Who was responsible for supplying the flag people? The stevedore. The stevedore. And that brings us to this issue of— So you've established the stevedore is negligent. The stevedore is certainly negligent. Okay. Then my point is what does the absence of a flag person show other than the stevedore is continually negligent? It's a specifically important fact because Captain Dovna says, I recognize that this operation was being done without it, and that is a dangerous condition that the captain, by his own testimony, acknowledges. One last issue. You equate condition with operation? I do because the circuit courts, this one and Clark, although in dicta, the Second Circuit, the Fourth Circuit, and the Ninth Circuit have all issued opinions where conditions, not defects in the vessel or its gear, have found vessel liability. So you've got basically the entire coast of the United States with the Fourth Circuit, the Fifth Circuit, the Eleventh Circuit, Clark, and the Ninth Circuit who have found in favor of Ms. Dixon's position on that issue. So for those reasons, I ask this court to reverse the lower court's decision and amend this case for trial. Thank you, counsel. We'll take that and the other cases under submission. Thank you.